# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| MUSIC CHOICE, <br>   *Plaintiff*, <br> v. <br> STINGRAY DIGITAL GROUP INC. and STINGRAY MUSIC, USA, INC., <br>   *Defendants*. | § § § § § § § § § | Case No. 2:16-cv-00586-JRG-RSP <br> **LEAD CASE** |
| STINGRAY MUSIC, USA, INC, <br>   *Plaintiff*, <br> v. <br> MUSIC CHOICE, <br>   *Defendant*. | § § § § § § § § | Case No. 2:16-cv-00964-JRG-RSP <br> **CONSOLIDATED CASE** |

## MEMORANDUM ORDER

Defendants Stingray Digital Group Inc. and Stingray, USA, Inc. (collectively "Stingray") filed a Daubert Motion to Exclude Certain Opinions and Testimony of Music Choice's Damages Expert (Dkt. No. 192), which is now before the Court. In this motion, Stingray moves to exclude certain opinions and testimony of Dr. Keith R. Ugone. Stingray seeks to exclude (1) Dr. Ugone's calculation of lost profits relating to two former Music Choice customers that switched their business to Stingray, (2) his analysis of the price erosion allegedly caused by Stingray's entry into the market with respect to ten Music Choice customers, and (3) his opinions on the commercial success of certain Music Choice products and services. (*Id*).[1] For the reasons set forth herein, Stingray's motion is **DENIED**.

---

[1] Upon receiving the motion, Music Choice filed a response (Dkt. No. 214), to which Stingray filed a reply (Dkt. No. 224) and Music Choice filed a sur-reply (Dkt. No. 236).

1

## I. BACKGROUND

### a. Background of this Action, including Patents-in-Suit

Music Choice filed this patent infringement action on June 6, 2016. (Dkt. No. 192, at 5).[2] This action involves audio and video on demand ("VOD") music channels transmitted to consumers by cable and satellite television providers who serve as multichannel video programming distributors ("MVPD"). (*Id*., at 1). MVPDs execute a contract with a music service provider where the MVPD agrees to pay the music service provider a monthly rate per subscriber in exchange for one or more music services, including, for example, audio or VOD music channels. (*Id*., at 2). Typically, each MVPD executes a contract with only one music service provider at a time for a period of several years. (*Id*., at 3).

After a stay of this action pending *inter partes* review ("IPR"), three patents-in-suit remained: U.S. Patent No. 9,357,245 (the "'245 Patent" or "Visual Complement Patent"), U.S. Patent No. 7,320,025 (the "'025 Patent"), and U.S. Patent No. 9,351,045 (the "'045 Patent"). The '245 Patent is directed to providing visual images to complement an audio data stream, e.g., album art relating to the song being played. (*Id*., at 5). The '025 and '045 Patents (collectively, the "VOD Linking Patents") are related patents and share a common specification. The VOD Linking Patents are directed to enabling users to exercise control over the selection and timing of the on-demand content they wish to view. (*Id*.).

### b. Parties

Music Choice, owned by several MVPDs, has been a music service provider since 1991. It offers audio through its Audio Service, which consists of audio music channels, and VOD music programming, through its VOD Service. (*Id*., at 3).

---

[2] The information in the background section was taken from the Parties' briefing. The Court does not hold that these facts are conclusively correct.

Stingray, which entered the United States in 2010, is Music Choice's only significant competitor. Stingray has three products in the United States relevant to Music Choice's claims: (1) the Music TV App, which consists of VOD music programming, which Music Choice accuses of infringing the '025 and '045 VOD Linking Patents; (2) the "OSE2" version of Stingray's UbiquiCAST system, which provides images corresponding to the music playing, which Music Choice accuses of infringing the '025 and '045 VOD Linking Patents; and (3) the "OSE1" version of its UbiquiCAST system, which only provides generic images and which Music Choice does not accuse of infringement in this case. (Dkt. No. 214, at 2).

### c. History of AT&T and Liberty

Music Choice first secured AT&T's subscriber business in March 2011, when it agreed to provide music channels and videos for a monthly rate of $0.12 per residential subscriber. (*Id*.). After the term expired in 2014, they renewed the deal for one year but at a new rate of $0.0931 per residential subscriber. (*Id*., at 3). When the new term ended in March 2015, AT&T switched to Stingray and its newly developed Music TV App, which had the same features and functionality as Music Choice's offerings, but at a lower price of $0.03 per residential subscriber. (*Id*.). While Stingray provided its Music TV App to multiple customers, only AT&T was provided a service accused of infringement. (Dkt. No. 192, at 5). In February 2018, AT&T, through its subsidiary, DirecTV,[3] re-signed with Music Choice at a lower rate than in 2014. (Dkt. No. 214, at 6 n.2).

Liberty Cable Vision of Puerto Rico ("Liberty") was another Music Choice customer. In March 2014, it switched its business to Stingray. Initially, it was provided the OSE1 version of the UbiquiCAST system, but starting in at least April 2016, Stingray began providing Liberty with the OSE2 version of the system. (*Id*., at 3).

---

[3] While DirecTV is a subsidiary of AT&T, it has a substantially larger subscriber base. (Dkt. No. 214, at 5–6).

### d. Dr. Ugone's Reports

Dr. Ugone submitted a damages report on September 27, 2017, and a post-stay supplemental report on April 12, 2019. (Dkt. No. 192, at 5). In the report, Dr. Ugone found that Music Choice suffered lost profits due to the loss of the AT&T and Liberty accounts caused by Stingray's alleged infringement of the Visual Complement Patent and VOD Linking Patents.

Dr. Ugone also calculated price erosion with respect to ten additional customers for whom Music Choice lowered its prices due to Stingray's alleged infringement of the VOD Linking Patents. In the supplemental report, Dr. Ugone updated the damages calculations, but his methodologies did not change. (*Id.*, at 6).

Finally, Dr. Ugone prepared a report on commercial success of the '245 Patent in support of Music Choice's position that the patents-in-suit are non-obvious. He opined that the technology in the '245 Patent has been the subject of significant commercial success. (*Id.*).

## II. STATEMENT OF LAW

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993)).

Under Rule 702 and *Daubert*, "a district court has broad discretion to determine whether a body of evidence relied upon by an expert is sufficient to support that expert's opinion." *Johnson v. Arkema*, 685 F.3d 452, 458–59 (5th Cir. 2012) (quoting *Knight v. Kirby Inland*

*Marine Inc.*, 482 F.3d 347, 354 (5th Cir. 2007)). The court acts as a gatekeeper, ensuring that admitted evidence is sufficiently reliable and relevant. *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at 597).

The expert opinion must be grounded in the methods and procedures of science—the opinion must go beyond unsupported speculation or subjective belief. *Daubert*, 509 U.S. at 590. The court's "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Id.* at 596.

### III. DISCUSSION

Stingray moves to exclude three portions of Dr. Ugone's expert testimony and opinions. First, Stingray believes Dr. Ugone's opinions on lost profits regarding two Music Choice customers, Liberty and AT&T, are flawed. For the Liberty calculation, Stingray argues Dr. Ugone misapplied *Panduit* factor 2. For the AT&T calculation, Stingray argues that Dr. Ugone made the mistaken assumption that the applicable rate would remain constant. Second, Stingray argues that Dr. Ugone's opinions on price erosion are flawed since his calculation attributes the entire difference in contract prices to Stingray's alleged infringement. Third, Stingray argues that Dr. Ugone's opinions that Music Choice's patented products are commercially successful are flawed since Dr. Ugone allegedly cites to general financial data without identifying products or services to which the data corresponds.

#### a. Dr. Ugone's Opinions on Lost Profits

Dr. Ugone opines that Music Choice should be awarded a total of $15.69 million in lost profits associated with two customers who switched to Stingray—$0.83 million for Liberty and $14.86 million for AT&T.

To recover lost profits, the patentee bears the burden of proof to show a "reasonable probability that, 'but for' infringement, it would have made the sales that were made by the infringer." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017) (quoting *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001)). "But-for" causation can be proven using the test given in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978). *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995); *see also Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013).

The four-factor *Panduit* test requires the patentee to show: (1) demand for the patented product; (2) an absence of acceptable, non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit that would have been made. *Panduit*, 575 F.2d at 1156. In a two-player market, where the patent owner and the infringer are the only suppliers of the product, causation may be inferred. *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983); *see also Livesay Window Co. v. Livesay Industries, Inc.,* 251 F.2d 469, 473 (5th Cir. 1958).

Stingray argues that Dr. Ugone's opinions are unreliable for his calculation of lost profits for both Liberty and AT&T. The Court will address these different customers separately below.

### i. Dr. Ugone's calculation of lost profits regarding Liberty

Stingray questions Dr. Ugone's application of *Panduit* factor 2, which is "the absence of acceptable non-infringing substitutes." *Panduit*, 575 F.2d at 1156. Stingray states that Dr. Ugone's conclusion that "OSE1 is not an acceptable non-infringing substitute because of the 'importance of the features and benefits enabled by the Visual Complement Patent'" is flawed. (Dkt. No. 192, at 8). Stingray cites to *Presidio Components*, which states that the "correct inquiry under *Panduit*

6

is whether a non-infringing alternative would be acceptable compared to the patent owner's product, not whether it is a substitute for the infringing product." (*Id.* (citing *Presidio Components*, 875 F.3d at 1381)). Thus, Stingray argues, Dr. Ugone incorrectly compared Stingray's non-infringing product, OSE1, to Stingray's allegedly infringing product, OSE2, when he should have compared OSE1, Stingray's non-infringing product, to Music Choice's patented product, Audio Service. Stingray also argues that, if Dr. Ugone made the correct comparison, he would have determined OSE1 was an acceptable non-infringing substitute. (*Id.*, at 8–9).

Music Choice counters that Dr. Ugone both made the correct comparison and found that OSE1 was lacking as a non-infringing alternative. (Dkt. No. 214, at 10–11). Music Choice argues that that "[t]he existence of other inferior products, like OSE1, is irrelevant, given that 'a "product on the market which lacks the advantages of the patented product can hardly be termed a[n] [acceptable] substitute."'" (*Id*, at 10 (quoting *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 96 F.3d 1409, 1418 (Fed. Cir. 1996) (quoting *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1371 (Fed. Cir. 1991)))). Music Choice explains that Dr. Ugone, in his report, shows that OSE1 lacked the commercially-desirable features that were present in both OSE2 and Audio Service, while also explaining why he considered the missing features to be a significant disadvantage of OSE1. (*Id.*, at 11).

The Court concludes that Dr. Ugone's analysis of lost profits under the *Panduit* test is sufficiently reliable with respect to Liberty. Stingray has not sufficiently shown that Dr. Ugone's analysis here is so unreliable that exclusion is warranted. Instead, the arguments presented by Stingray are better suited for a jury.

### ii. Dr. Ugone's calculation of lost profits regarding AT&T

7

Here, Stingray argues that Dr. Ugone's lost profits calculation is based on the false assumption that AT&T, had it not switched to Stingray, would have continued to pay Music Choice the same monthly subscriber rate throughout the entire period in question.[4] (Dkt. No. 192, at 9–10). Stingray argues that this allegedly false assumption makes the entire calculation speculative and unreliable. (*Id.*).

Stingray adds that "Dr. Ugone had failed to consider . . . the plethora of evidence demonstrating that monthly subscriber rates for music services" covered by the VOD Linking Patent varies. (*Id.*). It explains that Music Choice, in contract negotiations with AT&T, had lowered the rate it charged; that Stingray charged AT&T a significantly lower amount than Music Choice[5]; and that Music Choice executed a new contract with AT&T in February 2018, where they agreed to a lower rate.[6] (*Id.*). Stingray also argues that Music Choice's 2014 contract with AT&T covered more than just products involving the patents at issue in this case. Finally, Stingray argues that Dr. Ugone failed to consider that AT&T's competitors paid lower rates, which AT&T would have known, and that AT&T's subscriber counts were decreasing.

Music Choice argues that using "the actual contract rate negotiated between the parties just a year before the start of the damages period" is perfectly reasonable. (Dkt. No. 214, at 7). Music Choice adds that Stingray's expert did not challenge Dr. Ugone on this point, which shows the reasonableness of his choice. Music Choice also argues that Stingray's arguments go to the weight of the testimony, not its admissibility. Music Choice further argues that Dr. Ugone used a relatively conservative rate and that Dr. Ugone could have assumed multiple factors that would have led to

---

[4] This period ran from March 2015 to February 2018, when AT&T was a Stingray customer. (Dkt. No. 192, at 10).
[5] Stingray charged a monthly subscriber rate of $0.01. (Dkt. No. 192, at 10).
[6] Music Choice and AT&T, through its subsidiary DirecTV, agreed to a monthly subscriber rate of $0.0306. *Id.*

8

an increased rate. Finally, Music Choice addresses each of Stingray's criticisms, point by point. (*See id.*, at 8–10).

This Court finds that the former contract is relevant to the lost profit calculation. Further the Court concludes that using the former contract in the lost profit calculation is sufficiently reliable. Stingray's criticisms go to the weight, not admissibility, of Dr. Ugone's testimony. The issue of determining the weight that should be given to the 2014 contract rate is properly suited for the jury, as fact finder. *See Curtis*, 174 F.3d at 668 (citing *Daubert*, 509 U.S. at 597).

### b. Dr. Ugone's Opinions on Price Erosion

Stingray argues that Dr. Ugone's price erosion opinions are flawed, speculative, and unreliable, and thus, should be excluded. Stingray contends that his calculation that Music Choice has suffered $7.44 million, collectively, in price erosion from 10 customers with whom Music Choice entered into agreements is too high. Stingray's main critique is that Dr. Ugone assumed "the ***entire difference*** between the monthly subscriber rate in the original contract and the rate in the extension" was solely due to Stingray's alleged infringement. (Dkt. No. 192, at 12–13).

"Reduction of prices, and consequent loss of profits, enforced by infringing competition, is a proper ground for awarding of damages. The only question is as to the character and sufficiency of the evidence in the particular case." *Yale Lock Mfg. Co. v. Sargent,* 117 U.S. 536, 551 (1886). The Federal Circuit has explained that "'the question as to the character and sufficiency of the evidence' places the burden on the patentee to show that 'but for' infringement, it would have sold its product at higher prices." *Crystal Semiconductor*, 246 F.3d at 1357 (quoting *Yale Lock*, 117 U.S. at 551). The patentee's price erosion theory must account for the nature, or definition, of the market, similarities between any benchmark market and the market in which price erosion is

alleged, and the effect of the hypothetically increased price on the likely number of sales at that price in that market. *Id*.

Stingray argues that Dr. Ugone gave too much weight to the entry of Stingray's allegedly infringing products without considering other possible reasons for the lower monthly subscriber rates that make up the base of Dr. Ugone's price erosion calculation. Specifically, Stingray argues that Dr. Ugone did not consider whether any of Stingray's non-infringing music services caused Music Choice to offer lower monthly rates to its customers. Further, it explains other potentially-influential factors, such as changes in the market, including a decline in subscriber counts, price elasticity, and whether Music Choice provided products and services not covered under the relevant patents. Finally, it argues that Dr. Ugone made an assumption that Stingray considers flawed—that price erosion can result from new agreements with Music Choice customers that Stingray did not approach, since "informed businesspeople know other pricing in the marketplace." (Dkt. No. 192, at 14).

Music Choice first counters Stingray's arguments by saying that the arguments take "issue with Dr. Ugone's conclusions, not his methodology." (Dkt. No. 214, at 11). Also, Music Choice explains that Dr. Ugone begins his analysis with contracts made after Stingray had entered the market but before Stingray's allegedly infringing products entered the market. Therefore, the presence of Stingray's non-infringing offerings on the market appears to be accounted for in Dr. Ugone's report. Lastly, it is plausible that Music Choice was compelled by market forces to offer the three unapproached customers lower prices to match the price it needed to give its seven approached customers. This conclusion is supported by Stingray's consultant, Mr. Decker, who stated that "at some point in time, everybody would have been offered Stingray Music." (Dkt. No. 192-2, at 57).

None of Stingray's objections to Dr. Ugone's report on price erosion convince this Court that his report is so flawed that it should not be presented to the jury, where it can be subject to "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. . . ." *Daubert*, 509 U.S. at 596.

### c. Dr. Ugone's Opinions on Commercial Success

In support of Music Choice's claim that the Visual Complement Patent is not obvious, Dr. Ugone offered opinions that Music Choice's audio music channels are commercially successful. Stingray argues that Dr. Ugone cites to general financial data without identifying to which products or services the data corresponds. Thus, Stingray believes that Dr. Ugone's opinions relating to commercial success should be excluded as unreliable and based on a flawed methodology.

"The commercial [success of] an invention is significant to determinations of obviousness, and is entitled to fair weight." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988). "When a patentee asserts that commercial success supports its contention of nonobviousness, there must . . . be a sufficient relationship between the commercial success and the patented invention." *Id*. at 1392. "A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent." *Id*. "The judge, using ordinary reasoning, may determine that fact A might reasonably be inferred from fact B, and therefore that the party has satisfied his burden [of producing evidence], or as sometimes put by the courts, has made out a "prima facie" case." *Id*. (citing E.W. Cleary, *McCormick on Evidence* § 342 (3rd ed. 1984)).

Stingray agrees that Dr. Ugone has identified Music Choice's audio music channels as the service or product covered by the Visual Complement Patent but argues that he does not adequately demonstrate the success of Music Choice's audio music channels, themselves.

Music Choice counters by quoting this Court when it previously said, "[t]he nexus requirement goes primarily to the weight secondary considerations should be given, and the *Daubert* inquiry is one of admissibility rather than weight." *Genband US LLC v. Metaswitch Networks Corp.*, 2016 WL 98745, at *2 (E.D. Tex. Jan. 8, 2016) (citing *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004)). This Court went on to say, "[i]t is for the fact finder to determine the magnitude of the nexus that connects a given piece of evidence to the patents in suit and to give appropriate weight to that evidence. However, absent any nexus at all, the evidence cannot be entitled to any meaningful weight." *Id*.

The Court finds that a nexus between the commercial success of Music Choice and its Visual Complement Patent can be inferred from Dr. Ugone's expert report. Dr. Ugone's expert report on commercial success discusses not just the commercial success of Music Choice, but, specifically, the commercial success of Music Choice's Patented Visual Complement Technology. (*See* Dkt. No. 192-15, at 20–24). Consequently, "[i]t is for the fact finder to determine the magnitude of the nexus that connects a given piece of evidence to the patents in suit and to give appropriate weight to that evidence." *See Genband*, 2016 WL 98745, at *2.

## IV. CONCLUSION

Stingray's *Daubert* motion (Dkt. No. 192) is therefore **DENIED**.

**SIGNED this 24th day of October, 2019.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE